**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**CHARLES A. MORRIS & ASSOCIATES, INC., formerly known as Morris Darley and Associates, Inc., and Tax Free Bonds, et al., Defendants.**

Civ. A. No. C–72–368.

United States District Court,
W. D. Tennessee, W. D.

Feb. 1, 1973.

James E. Birchby, SEC, Washington, D. C., for SEC.

Hal Gerber and Eugene Berstein, Memphis, Tenn., for Charles A. Morris

& Associates, Charles A. Morris, Edward Disbrown Morris, Ray Thomas Bauman and Charles T. Chicorelli.

Henry L. Klein, Memphis, Tenn., for Michael Patrick McTighe.

B. C. Clifton, Memphis, Tenn., for Claude Dean Dillard.

Jim Walker Cunningham, pro se.

Albert Boyd, Memphis, Tenn., for Ted L. Cutshaw.

Robert G. Gilder, Southaven, Miss., for Ronald Lee Epperson, and Roy G. Lovelace.

John William Ferrell, pro se.

Armistead F. Clay, Memphis, Tenn., for Gary Crizer Hottum.

Harold Weiss, Memphis, Tenn., for Steven Adams Lancaster.

Raymon Sauer, Memphis, Tenn., for Malcolm E. Ratliff.

Louis F. Allen, Memphis, Tenn., for Roger Charles Russell.

Donald Bryan Smith, pro se.

Olen C. Batchelor, Jr., Memphis, Tenn., for Roy Langston White.

## MEMORANDUM DECISION

BAILEY BROWN, Chief Judge.

This action was brought by the Securities and Exchange Commission pursuant to § 20(b) of the Securities Act of 1933 and § 21(e) of the Securities Act of 1934. The Commission alleges that from March, 1971 to the present time, the defendants, a Memphis municipal bond firm and a number of its officers and employees, violated § 17(a) of the 1933 Act,[1] and also violated § 10(b) of the 1934 Act[2] and Commission Rule 10b–5[3] promulgated thereunder. The Commission seeks injunctive relief and disgorgement of unlawful profits.

An extensive hearing was held solely on the plaintiff's motion for a preliminary injunction. In support of its motion, the plaintiff presented several documents filed by James E. Birchby, a Commission attorney who did much of the investigative work on this case. These documents included an extensive summary affidavit, a later supplement to the summary affidavit and a detailed trading analysis. The plaintiff also introduced the affidavits of various indi-

---

[1] "(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

[2] "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
   \*    \*    \*    \*    \*
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

[3] "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security."

vidual purchasers, as well as five affidavits submitted by experts in the municipal bond industry concerning pricing practices in that industry. Birchby was the only witness called by the plaintiffs to testify at the hearing.

In response to the motion, certain of the defendants submitted counteraffidavits. The defendants, Charles Morris, Edward Morris, McTighe and Dillard, testified at the hearing. In addition, G. L. Bartlett, a municipal bond dealer presently residing in Phoenix, Arizona, was called by some of the defendants to testify as to pricing practices in the municipal bond industry.

At the outset, we should point out that three of the original defendants, Hottum, Cutshaw and Russell, have consented to the entry of a permanent injunction against them. The defendant Hottum has, in addition, paid $915 into the Court in connection with the Commission's prayer for disgorgement of unlawful profits. In the remainder of this opinion, we shall set out the findings and conclusions supporting our decision to grant the plaintiff's motion for a preliminary injunction against all of the remaining defendants.

In Parts I and II of this opinion we have briefly described the individual defendants and the general character of the operation conducted by the defendants. The nature of the particular bonds involved in this action is the subject of Part III. In Part IV we deal with two threshold legal questions, and in Part V we describe the violative conduct in which the defendants have engaged. Finally, in Part VI, we explain why preliminary injunctive relief is appropriate in this case.

## I. THE DEFENDANTS

Charles A. Morris & Associates, which deals exclusively in municipal bonds, had offices in Memphis and nearby Southaven, Mississippi. Incorporated in Mississippi in 1968, it has engaged in only limited activities since March, 1972. Prior to assuming its present name in February, 1972, the corporation operated under the names, Tax Free Bonds, Inc. and Morris-Darley and Associates, Inc. Its best known name is Tax Free Bonds and it will hereinafter be referred to as "Tax Free."

The defendant Charles Morris has been president, director and a principal shareholder of, as well as a trader for, Tax Free since its inception. He has been responsible for the supervision of all the corporation's activities. These included approving Tax Free's municipal bond transactions, determining the pricing practices of its salesmen, selecting with the defendant McTighe the bonds to be purchased and sold by the corporation and the hiring and firing of salesmen.

The defendant Michael McTighe served Tax Free as a vice-president, a manager and trader from July, 1971 through at least March 17, 1972. He was general manager of the "McTighe Division," a group of seven salesmen including the defendants Russell and White. McTighe had authority to hire and fire the salesmen in his division and to administer his division in all respects. During the relevant period, salesmen under McTighe's supervision, and occasionally other Tax Free salesmen, submitted to him for approval, on at least a daily basis, order tickets (or pencil slips) showing the terms for a sale of bonds which a customer had just agreed, over the telephone, to purchase. This document always reflected the sale price to the customer and often reflected the cost of the bonds to Tax Free. In 1972, McTighe left Tax Free to organize with Charles Morris and G. L. Bartlett a municipal bond firm named Valley Western Securities, Inc., now operating in Memphis.

The defendant Claude Dean Dillard was associated with Tax Free from May, 1971 to at least March, 1972. In addition to making some sales himself, he served as a trader, a vice-president and, from approximately August through December, 1971, he served as the manager of the Southaven office. While at the Southaven office, he supervised several

salesmen, including the defendants Bauman, Chicorelli, Ferrell, Hottum, Cutshaw, Phillips and Smith. As a supervisor, he was required to approve the order tickets turned in by his salesmen. In his capacity as manager of the Southaven office, Dillard occasionally listened to the salesmen as they made sales presentations to investors over long distance telephone and advised the salesmen as to how they might improve their selling techniques. Beginning in January, 1972 Dillard and the salesmen at Southaven were brought to the Memphis office, and the Southaven office was closed. From then through March, 1972 Dillard continued to act as a supervisor and trader at Tax Free. At the present time, Dillard is employed at Universal General Securities, Inc., a municipal bond firm located in the Memphis area.

Edward Morris, younger brother of Charles Morris, has been a vice-president and director since approximately 1970. For some time, he has had an option to purchase fourteen per cent of the corporation's stock, but has never exercised that option. Morris engaged in his own personal sales activity and has been responsible, in part, for the training furnished Tax Free salesmen. During the Commission's investigation of this matter, Charles Morris testified, in a deposition, that Edward Morris occasionally approved the salesmen's order tickets. Edward Morris is presently employed as a bond salesman at Fidelity Security Corporation.

All of the above-named individual defendants—Charles Morris, McTighe, Dillard, and Edward Morris—regularly met together as Tax Free's top management personnel. As top management officials, they were all aware of the corporation's pricing policies and sales practices.

The remaining defendants—Bauman, Chicorelli, Cunningham, Epperson, Ferrell, Lancaster, Lovelace, Phillips, Ratliff, Smith and White—were employed, during at least a part of the relevant period, as municipal bond salesmen at Tax Free. At least Epperson, Lovelace, Ratliff and White are still in the municipal bond business.

## II. GENERAL CHARACTER OF TAX FREE'S OPERATION

At the hearing on this motion there emerged the following picture of Tax Free's operation, as it existed during the relevant period. All of Tax Free's transactions were effected on a principal basis. Tax Free solicited its customers almost exclusively by long distance telephone. The investors contacted by the salesmen were generally financially secure and of middle to advanced ages. They included a substantial number of retired professionals and widows. For the most part, they consisted of people with limited investment experience and little or no knowledge of municipal bonds.

The entire system of telephone solicitations was geared toward inducing hasty investment decisions. In order to effect a sale, a salesman was disposed to tell the customer anything which might influence the investor to make up his mind. For example, the salesman often told the customer that there was a limited supply of the bonds sought to be sold or that a special bargain price was available only for a limited time. Such representations were almost always false.

Salesmen at Tax Free were generally put to work on the phone without adequate training. Most either received no training whatsoever or received limited training only after they had already commenced their telephone solicitations. The salesmen were under tremendous pressure to produce large profits. The threat of being fired loomed constantly. Also, special incentives spurred them to greater efforts. For example, a fleet of leased Cadillac and Lincoln Continental automobiles was maintained by Tax Free and made available to the salesmen for their use. The salesmen were advised, however, that if their sales production was not up to certain standards,

they would have to pay the monthly rental or give up the use of the car.

In concluding this brief description of Tax Free's operation, a word should be said of the corporation's system of keeping books and records. Tax Free maintained few of the records traditionally maintained by securities broker-dealers. It did not maintain customer ledger accounts, security position records, firm trading accounts or customer opening account cards. Although a securities purchase and sales blotter was maintained, it was grossly inaccurate and inadequate. For example, this record contained no entry for any sale which was subsequently cancelled. In addition, the date reflected on the blotter for a transaction was usually neither the trade date nor the settlement date. Often the date was ascertained from Tax Free's clearing house. By that time the transaction had been entirely consummated.

## III. SPECIFIC BONDS INVOLVED

The Commission's investigation focused on the sales by Tax Free of the following three bonds: (1) St. Louis Metropolitan Transit Revenue Bonds, 4.-125% interest, due 3–1–1993, issued by the Bi-State Development Agency of the Missouri-Illinois Metropolitan District (hereinafter called "Bi-State Bonds"), (2) City of East St. Louis, Illinois Bridge Revenue Refunding and Improvement Bonds, 3.750% interest, due 1–1–1985 (hereinafter called "Bridge Bonds") and (3) Montgomery County, Maryland General Obligation Bonds., .100% interest, most of which are due 11–1–2001 (hereinafter called "Montgomery Bonds").

The Bi-State Bonds were issued in 1963 to finance the acquisition of transit facilities in the St. Louis area. In April, 1971, the trustee for the Bi-State Transit Authority issued to bond holders a letter stating that its net operating revenue for the period covering March 1, 1971 through February 29, 1972, would not be sufficient to make principal and interest payments on the Bi-State bonds for that period. On October 11, 1971, Standard and Poor's dropped its relatively high "BBB" rating on the Bi-State Bonds. On March 1, 1972, the trustee reported that the outlook had worsened to the point that revenues would not be sufficient to pay interest and principal on the bonds after September, 1972.

The Bridge Bonds were issued in 1956 to finance a toll bridge in the East St. Louis area. During the period in question, these bonds were given a "B" rating by Standard and Poor's Corporation. Such a rating is given to those bonds in which investment characteristics are virtually non-existent and default could be imminent. Also, during the period in question, there were circulating in the industry various reports, including newspaper articles, to the effect that operating revenues were declining and might not be sufficient to continue to meet required interest and principal payments because of the construction nearby of a toll free bridge which was part of an interstate highway system.

The Montgomery Bonds were highly rated fractional general obligation bonds. Because they generate a very low interest of one-tenth of one per cent, they are traded at a large discount. For the same reason, unlike most municipal bonds, their chief attraction lies in their capital appreciation at maturity, rather than in their generation of tax free interest income.

## IV. APPLICATION OF ANTIFRAUD PROVISIONS TO MUNICIPAL BONDS AND THE EVIDENTIARY SHOWING REQUIRED OF THE COMMISSION

■ Defendants, pointing out that municipal bonds are exempt from the registration and certain other requirements of the 1933 Act, question whether the antifraud provisions apply to transactions involving municipal bonds. Section 17(c) of the 1933 Act specifically answers this question by providing that the above-mentioned exemption "shall not apply to the provisions of this section." The defendants' conduct is there-

fore clearly governed by the standards set forth in § 17(a) of the 1933 Act.

▮ The standards expressed in § 10(b) of the 1934 Act also govern the defendants' sales of municipal bonds. The term "security," as used in § 10(b), is more than broad enough to include municipal bonds within the scope of its coverage. See the definition of "security" contained in § 3(a)(10) of the 1934 Act.

▮ Before discussing the substantive violations committed by the defendants, we should define the evidentiary showing required of the Commission. To prevail on this motion, the Commission need only present a prima facie showing that the defendants' past conduct constitutes a violation of the antifraud provisions and show that the past conduct indicates a reasonable likelihood of further violations in the future. Securities and Exchange Commission v. Bennett & Co., 207 F.Supp. 919 (D.N.J. 1962). See, also, III Loss, Securities Regulation 1979 (1961 ed.).

## V. VIOLATIONS

### A. THE SALESMEN

The evidence presented by the Commission was more than adequate to constitute a prima facie showing that each of the defendant salesmen made misrepresentations of and/or omitted to disclose material facts. In section one, we shall briefly set forth some of those misrepresentations and omissions. In section two, we shall devote special attention to those misrepresentations and omissions which pertained to the price of municipal bonds.

### 1. *Misrepresentations and Omissions Not Pertaining to Price*

Tax Free salesmen, in connection with the sale of bonds, made numerous misrepresentations, including, but not limited to, the following: that certain bonds were being offered by persons needing to sell the bonds to establish a tax loss or raise money to pay taxes when, in fact, such was not the case; that there

was available only a limited supply of bonds sought to be sold when, in fact, the supply was abundant; that certain bonds were general obligation bonds when, in fact, they were revenue bonds; that the payment of interest and principal of certain bonds was guaranteed by the state and federal governments when, in fact, payment was not so guaranteed; that certain securities were presently rated "BBB" by Standard and Poor's Corporation when, in fact, that rating had been withdrawn; that the financial condition of certain issuers was good when, in fact, the issuers were experiencing severe financial difficulties; and, that a purchase of bonds offered would be a safe investment when, in fact, the investment was highly speculative.

On numerous occasions, Tax Free salesmen, in connection with the sale of bonds, omitted to state important facts, including, but not limited to the following: that certain bonds were revenue bonds; that certain bonds had been given a very low "B" rating by Standard and Poor's; that a purchase of certain bonds was a speculative investment; that Tax Free was selling to the customer securities for its own account rather than acting as an agent for the customer; that the bonds matured at a date in the distant future; that the issuers of certain bonds were experiencing severe financial difficulties adversely affecting the likelihood of their continued payment of interest and principal; and that the rate of interest on the Montgomery Bonds was negligible, being only a fraction of one per cent.

▮ The facts enumerated above, both those which were the subjects of misrepresentations and those which the salesmen failed to disclose, constituted the kind of information to which a reasonable investor would attach significance in the making of his investment decision. Thus, these facts were "material" within the meaning of § 17(a) of the 1933 Act and of rule 10b–5 promulgated under § 10(b) of the 1934 Act. Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833,

849 (2d Cir. 1968). Accordingly, the salesmen's misrepresentations and omissions constituted violations of the anti-fraud provisions.

### 2. *Misrepresentations and Omissions with Respect to Price*

The Commission contends that on a number of occasions the defendant salesmen represented to customers that the prices at which they were offering bonds were at or below the then current market prices when, in fact, such was not the case. Even more often claims the Commission, the salesmen omitted to tell customers that the prices at which bonds were offered greatly exceeded the then current market price.

To support its contention that bonds were sold at excessive prices, the Commission submitted an analysis of all of Tax Free's sales of Bi-State, Bridge and Montgomery Bonds made during the period of November 15, 1971 through June 27, 1972. The analysis shows that in a majority of the transactions, Tax Free's sales prices were anywhere from twenty-five to over one hundred per cent greater than Tax Free's contemporaneous cost for the bonds.[4] Under the circumstances of this case, Tax Free's contemporaneous cost for the bonds in question constituted an accurate indication of the relevant market price for the period analyzed. Therefore, Tax Free salesmen were selling the bonds at prices in excess of the then current market prices.[5]

■ Throughout the period analyzed, Tax Free was able to purchase, on a regular basis, bonds in small blocks, as well as large, at prices far below those at which they were consistently selling the bonds to their customers during this same period. The purchasers had a right to know that the bonds could be purchased at lower prices. The salesmen's representations that the bonds were being sold at or below market price were clearly misleading. The failure to inform the customers that the bonds were sold at prices greatly in excess of the then current market prices constituted an omission to disclose a material fact within the meaning of § 17(a) and Rule 10b–5. Charles Hughes & Co. v. Securities and Exchange Commission, 139 F.2d 434 (2d Cir. 1943).

■■ At the hearing, some of the defendants attempted to justify Tax Free's large mark-ups. They claimed that Tax Free had built up large inventories of the bonds in question and that it was necessary to make large profits on individual sales in order to protect against possible future losses stemming from downward fluctuations in the value of those bonds still held in the inventories. To this attempted justification there are at least three responses. First, the fact that Tax Free may have been riskily oversupplied with speculative bonds did not relieve it or its salesmen of their obligation to tell customers that the bonds could be bought at lower prices.[6] Second, the record discloses that in any event, many of the transactions were "riskless" sales to which the justification posed above simply will not apply. In these transactions, Tax Free first agreed to sell some particular bonds to an individual investor at a cer-

---

4. The analysis further shows that Tax Free's sales prices exceeded by even greater margins the contemporaneous offering quotations listed by other municipal bond dealers in the Blue List and Tax Free's contemporaneous sales prices to other dealers.

5. We have no doubt that Tax Free's mark-ups over market prices were excessive. The Commission presented an abundance of evidence establishing that it. is the practice in the municipal bond industry to charge a retail customer a price which is no more than one-quarter of one per cent to five per cent

over the then current market price for a bond.

6. In this connection, we might add that even if Tax Free's position in one or more of these bonds was of such strength that it was making a market in the bonds—thereby adversely affecting the ease with which a retail customer could purchase the bonds at a lower price from another dealer—we would be compelled to hold that there was fraud in the salesmen's failure to disclose this market making role. Chasins v. Smith, Barney & Co., 438 F.2d 1167 (2d Cir. 1970).

tain price and then later purchased those bonds for its own account from another source at a price much lower than that which the individual customer had agreed to pay. Finally, we note that as to the Montgomery Bonds, which were non-speculative general obligation bonds, the mark-ups were even higher than on the Bi-State and Bridge Bonds. The fact that virtually no risk was involved in the purchase and sale of Montgomery Bonds did not prevent Tax Free from selling those bonds at excessively high prices.

Finally, we should say a word about Tax Free's practice of adjusted trading.[7] In less than twenty-five per cent of the transactions analyzed by the Commission, Tax Free purchased bonds from a customer at a price in excess of the then current market price for those bonds and simultaneously sold other bonds to the same customer, also at prices above the market price. In calculating the mark-ups on the sales involved in these transactions, the Commission did not take into consideration the amount paid to the customer in excess of the market price. The defendants contend that if Tax Free is given a "credit" for its purchase side of these adjusted trades, the mark-ups in these transactions will be reduced to conscionable levels. Therefore, say the defendants, any failure on the part of the salesmen to disclose the market price for the bonds being sold to the customers was not violative of the Securities Act. We cannot agree. First, the evidence shows that in several instances, even if credit were given on the adjusted trades, the mark-ups would still not be reduced to reasonable levels. Second, it should be noted that in many of the adjusted trades the bonds being purchased by Tax Free from the investor were bonds which Tax Free had previously sold to the investor at excessive prices. In these instances, the adjusted trade was clearly utilized solely to cover up unreasonably high profits already taken from the customer. Finally, in any event, we believe that a salesman who makes an adjusted trade should disclose the nature of that transaction to the customer. A customer should be apprised of the fact that a dealer is willing to acquire bonds for more than they are worth in order to dispose of bonds of its own at excessively high prices. Such knowledge might induce an investor to have second thoughts about acquiring bonds, the sale of which the dealer is so anxious to make.

## B. THE CORPORATION AND ITS TOP MANAGEMENT OFFICIALS

The corporation is responsible, on the theory of *respondeat superior,* for the unlawful acts of its salesmen. Armstrong, Jones & Co., v. Securities and Exchange Commission, 421 F.2d 359, 362 (6th Cir. 1970), cert. denied 398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970); Cady, Roberts & Co., 40 S.E.C. 907, 911 (1961).

The top management officials, Charles Morris, McTighe, Diliard and Edward Morris, are also subject to sanctions, as aiders and abettors of the fraudulent conduct in which the salesmen engaged. Brennan v. Midwestern Life Insurance Co., 259 F.Supp. 673, 681–682 (N.D.Ind.1966), aff'd 417 F.2d 147 (7th Cir. 1969), cert. denied 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). These men set up, supervised and had complete control over all the operations at Tax Free. They were well aware that the salesmen were selling bonds at excessively high prices. They all had a hand in establishing a policy which encouraged the salesmen to employ whatever means necessary to effect profitable transactions. Constant threats to fire and offerings of lucrative incentives were the means by which this policy of exhortation was carried out.

Tax Free salesmen were never instructed to try to determine a poten-

---

7. It is worth mentioning that the practice of adjusted trading has been made unlawful in the State of Tennessee. Tenn.Code Ann. § 9–1414.

tial customer's financial condition, his securities holdings and his investment goals. The Tax Free officials felt that it was neither necessary nor advisable to make any such inquiry in order to have a reasonable basis for recommending a municipal bond to an investor. Their failure to properly train and supervise their employees ensured that an investor who did business with Tax Free would not receive either the information or the counseling required to make a sound investment decision. A dealer in securities warrants to the public that it will deal with it competently and in good faith. Charles Hughes and Co. v. Securities and Exchange Commission, *supra.* Tax Free's top officials made no effort to uphold this guarantee.

■ In essence, Tax Free's set-up had all of the elements of a classic "boiler room" operation: unqualified, improperly supervised salesmen; high pressure long distance telephone sales designed to induce hasty investment decisions by customers about whose financial conditions the salesmen knew very little; and heavy dealings in speculative bonds of issuers about whose adverse financial conditions there was very little disclosure. We believe the maintenance of such conditions in and of itself constitutes a violation by the corporation and those in control of provisions (1) and (3) of § 17(a) and provisions (a) and (c) of Rule 10b–5. See Berko v. Securities and Exchange Commission, 297 F.2d 116 (2d Cir. 1961). The maintenance of these conditions stands in harsh conflict with the Act's purpose to protect investors. Implementing that purpose, therefore, requires that the use of "boiler room" operations be abolished.

## VI. THE NEED FOR INJUNCTIVE RELIEF

In the preceding pages we have indicated the basis for our belief that the Commission has presented a prima facie showing that the defendants' past conduct constituted violations of the antifraud provisions of the Securities Acts. We also conclude that the past conduct of the defendants indicates a reasonable likelihood of further violations in the future.

■ The evidence shows flagrant violations of the relevant statutory provisions. As to those defendants who are remaining in the municipal bond business—Charles Morris, McTighe, Dillard, Edward Morris, Epperson, Lovelace, Ratliff and White—the public interest requires that they, and the corporate defendant, be preliminarily enjoined from committing further violations of the Securities Act. The fact that these defendants claim to have ceased their illegal conduct is no bar to the injunction. See e. g., Otis & Co. v. Securities and Exchange Commission, 106 F.2d 579 (6th Cir. 1939).

There has been no showing that the remaining defendants—Bauman, Chicorelli, Cunningham, Ferrell, Lancaster, Phillips and Smith—are planning to remain in the municipal bond business. However, we believe that injunctive relief is also appropriate as to these defendants. In so concluding, we adopt the rationale stated in Securities and Exchange Commission v. Kamen & Co., 241 F.Supp. 430 (S.D.N.Y.1963), a case involving the propriety of preliminarily enjoining defendants who claimed that they intended to leave the securities business altogether. In that case, the District Court granted the injunctive relief on the grounds that (1) the defendants' conduct was "so egregious as to cast doubt on their protestations of future innocence" and (2) any injury stemming from the injunctive order, "at least in the light of the actions which brought them before this court," would be minimal if the defendants did, in fact, leave the securities business. On this last point, the Court noted that if the defendants' good intentions were to dissolve in the future, the public would have the protection of the injunctive decree. Securities and Exchange Commission v. Kamen & Co., supra, at 429–430. Application of the rule set forth in Kamen & Co. to the instant case leads us to enjoin the remaining defendants.