Filed:   January 13, 1998

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

No. 97-1315
(CA-95-1091-K)

---

Banca Cremi, S.A., etc., et al,

                              Plaintiffs - Appellants,

        versus

Alex. Brown & Sons, etc., et al,

                              Defendants - Appellees.

---

O R D E R

---

The Court amends its opinion filed December 30, 1997, as follows:

On page 2, section 1, line 17 -- Amicus' name in the counsel listing is corrected to read "PSA THE BOND MARKET . . . ."

                              For the Court - By Direction


                              /s/ Patricia S. Connor
                              _____
                                         Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BANCA CREMI, S.A., Institucion de
Banca Multiple, Grupo Financiero
Cremi; BANCA CREMI GRAND
CAYMAN,
<u>Plaintiffs-Appellants,</u>

v.

No. 97-1315

ALEX. BROWN & SONS,
INCORPORATED; JOHN ISAAC EPLEY,
<u>Defendants-Appellees.</u>

SECURITIES & EXCHANGE COMMISSION;
PSA THE BOND MARKET TRADE
ASSOCIATION,
<u>Amici Curiae.</u>

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Frank A. Kaufman, Senior District Judge.
(CA-95-1091-K)

Argued: September 29, 1997

Decided: December 30, 1997

Before LUTTIG and WILLIAMS, Circuit Judges, and MAGILL,
Senior Circuit Judge of the United States Court of Appeals for the
Eighth Circuit, sitting by designation.

_____

Affirmed by published opinion. Senior Judge Magill wrote the opin-
ion, in which Judge Luttig and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Howard N. Feldman, DICKSTEIN, SHAPIRO, MORIN & OSHINSKY, L.L.P., Washington, D.C., for Appellants. Susan Sholar McDonald, Senior Litigation Counsel, SECURITIES AND EXCHANGE COMMISSION, Washington, D.C., for Amicus Curiae SEC. Michael Roger Klein, WILMER, CUTLER & PICKERING, Washington, D.C., for Appellees. **ON BRIEF:** Howard Schiffman, Woody N. Peterson, Jennifer Tara Holubar, DICKSTEIN, SHAPIRO, MORIN & OSHINSKY, L.L.P., Washington, D.C., for Appellants. Richard H. Walker, General Counsel, Jacob H. Stillman, Associate General Counsel, Susan K. Straus, SECURITIES AND EXCHANGE COMMISSION, Washington, D.C., for Amicus Curiae SEC. Robert F. Hoyt, Adam R. Waldman, WILMER, CUTLER & PICKERING, Washington, D.C., for Appellees. Peter Buscemi, Lloyd H. Feller, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C.; Robert C. Mendelson, Katherine M. Polk, MORGAN, LEWIS & BOCKIUS, L.L.P., New York, New York; Paul Saltzman, Senior Vice President and General Counsel, PSA THE BOND MARKET TRADE ASSOCIATION, New York, New York, for Amicus Curiae Association.

---

**OPINION**

MAGILL, Senior Circuit Judge:

Banca Cremi, S.A., Institucion de Banca Multiple, Grupo Financiero Cremi and Banca Cremi Grand Cayman (together, the Bank) purchased a number of collateralized mortgage obligations (CMOs) through John Isaac Epley, a broker with the brokerage firm of Alex. Brown & Sons, Incorporated (Alex. Brown). Although most of its CMO purchases were profitable, the Bank lost money on six CMO purchases after the market in CMOs collapsed in 1994. The Bank brought suit in the district court against Epley and Alex. Brown, alleging that Epley and Alex. Brown had committed securities fraud in violation of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by making material misrepresentations and omissions regarding the CMOs, by selling securities that were unsuitable, and by charging excessive

2

markups. The Bank also alleged Texas state common-law tort claims for fraud, negligence, negligent misrepresentation, and breach of fiduciary duty, and a claim based on the Maryland Securities Act. The district court granted Epley and Alex. Brown's motion for summary judgment on all of the Bank's claims,[1] and the Bank now appeals. We affirm.

I.

A.

CMOs, first introduced in 1983, are securities derived from pools of private home mortgages backed by U.S. government-sponsored enterprises.[2] From 1987 to 1993, U.S. government-sponsored CMO issuances grew dramatically, from $900 million to $311 billion per year. The market in CMOs largely collapsed in 1994, and in 1995 new issuances fell to $25.4 billion.

Historically, investments in fixed-rate home mortgages have not been attractive to institutional investors. Investors in most fixed-rate securities benefit when interest rates fall. The fixed-rate security then earns interest at a rate higher than decreased prevailing rates. However, unlike other fixed-rate investments such as U.S. treasuries, fixed-rate home mortgages do not benefit from declines in interest rates. Because home mortgages may be freely prepaid, home owners frequently refinance their homes to take advantage of a drop in interest rates. When the mortgage is prepaid, the investor's funds are returned. If the investor seeks to reinvest those funds, as would be the case with most institutional investors, they must be reinvested at the low prevailing rate, rather than earning interest at the higher rate of the original mortgage. This is called the "prepayment risk." If interest rates rise, home mortgages are generally not refinanced, and they lose value just like any other fixed-rate security. Thus, investments in

---

[1] The district court's opinion is recorded at Banca Cremi v. Alex. Brown, 955 F. Supp. 499 (D. Md. 1997).

[2] These entities include the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, and the Government National Mortgage Association.

home mortgages perform poorly both when interest rates rise and when they fall.

CMOs concentrate the prepayment risk in some securities in order to reduce that risk in other securities. In so doing, CMOs were designed to make home mortgage investments more attractive to institutional investors, increase the liquidity in the secondary home mortgage market, and reduce the interest costs to consumers buying homes.

A CMO issuer begins with a large pool of home mortgages, often worth billions of dollars. Each pool of home mortgages generates two streams of income. The first income stream is the aggregate of all interest payments made on the underlying mortgages. The second income stream is the aggregate of all principal payments made on the underlying mortgages. These income streams are divided into numerous CMO "tranches," which are the securities sold to investors. To determine what portion of the two income streams are received by an investor in a CMO tranche, each tranche has two unique formulae: one that determines the tranche's interest rate, and the other that determines the tranche's principal repayment priority.

The interest rate on a CMO tranche can be a fixed rate, a floating rate, or a rate that floats inversely to an index rate. Floating interest rates can also be leveraged, meaning that the interest rate shifts more dramatically than the index rate. For example, where a floating rate CMO is leveraged by a multiplier of two, the CMO's interest rate will increase by two percent when the index rate increases by one percent.

The tranche's principal repayment priority determines when the tranche will receive principal payments made on the underlying mortgages. Each principal payment is divided among all of the tranches in a CMO issuance. High priority tranches receive principal payments first. Support tranches receive principal payments last. Because of this, support tranches are the most sensitive to "extension risk." Extension risk is the opposite of prepayment risk: when interest rates rise, the expected maturity of the support tranche CMO increases, often dramatically.

CMO tranches are categorized into classes which have similar properties and risks. The least risky is the planned amortization class

4

(PAC). PACs have little prepayment risk, and appeal to institutional investors for this reason. Two of the riskiest classes of CMOs, inverse floaters and inverse interest-only strips, are at issue in this litigation.

Inverse floaters have a set principal amount and earn interest at a rate that moves inversely to a specified floating index rate. Inverse floaters will often be leveraged, so a small increase in interest rates causes a dramatic decrease in the inverse floating rate. Usually, inverse floaters are also support tranches, so an increase in interest rates causes their maturity date to extend. Inverse floaters earn high returns if interest rates decline or remain constant, but lose substantial value if interest rates increase.

Inverse interest-only strips (inverse IOs) do not receive principal payments. The interest rate for an inverse IO floats inversely to a specified index rate, like an inverse floater. Interest is calculated by reference to the outstanding principal amount of another reference tranche. As the reference tranche is paid off, the principal on which the inverse IO earns interest decreases accordingly. Like an inverse floater, a rate increase reduces the inverse IO's floating rate. According to some investors, a rate increase also reduces prepayment of the reference tranche, extending the maturity of the inverse IO and, ultimately, increasing the total interest payments made on the inverse IO.

Inverse floaters were first introduced in 1986. Inverse IOs were introduced in 1987. Markets for both of these securities remained strong in the environment of decreasing or stable interest rates that predominated between 1986 and the beginning of 1994. On February 4, 1994, the Federal Reserve Board increased short-term interest rates for the first time in five years. Over the next nine months, short-term rates increased by a total of 2.5 percent, from 3 percent to 5.5 percent. In response to the rate increases, a wave of selling hit bond markets and investors in all types of bonds suffered significant losses.[3]

_____

[3] Most fixed-rate investments dropped significantly in value. Five-year bonds had their worst year since 1926. The price on zero-coupon treasuries dropped 18.7 percent, while long-term treasury bonds lost 7.5 percent in value.

5

CMOs were particularly hard hit, for a variety of reasons. The jump in rates halted mortgage prepayments. This in turn extended the average maturity of all CMOs, including, most dramatically, support tranche CMOs such as inverse floaters. Because of their degree of leverage, certain CMOs were extremely sensitive to the interest rate jumps, and their holders flooded the market after the first interest rate increase. CMO liquidity, which had never been a problem in the stable or declining interest rate environment that had existed since their introduction, dried up as all CMO holders tried to sell. The fear of liquidity problems built on itself, reducing the number of willing purchasers during the critical period after the Federal Reserve Board increased interest rates. In April 1994 an investment fund which primarily invested in CMOs filed for bankruptcy, reporting near total losses of its $600 million CMO investment. As a result of these incidents, the market in CMOs virtually collapsed in 1994.

B.

Alex. Brown is a securities brokerage firm, incorporated under the laws of Maryland, with its principal place of business in Baltimore, Maryland. Alex. Brown is registered as a broker-dealer under § 15 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78o. Beginning in April 1993, John Isaac Epley was employed by Alex. Brown in its Houston, Texas office as a vice president. Prior to his employment by Alex. Brown, Epley had worked in Houston as a securities broker for MMAR Group.

Banca Cremi, S.A., is a credit institution incorporated under the laws of Mexico. Banca Cremi Grand Cayman is its wholly owned subsidiary, incorporated under the laws of the Cayman Islands. Both institutions have their principal place of business in Mexico City, Mexico. On June 30, 1993, the Bank had assets of nearly $5 billion and an annual operating income in excess of $36 million.

The Bank's Nuevos Negocios Internacionales (NNI) unit specialized in international investment transactions. The unit engaged in Eurobond issuances, interest rate swaps, investments in Brady Bonds, and various other esoteric investments. According to the NNI monthly reports, the NNI unit held investments with a face value of up to $115

6

million during 1993 and accumulated income of over $6 million that year. J.A. at 482.

Three individuals had primary oversight responsibilities for the NNI unit's operations and investments. The NNI unit director, Jose Luis Mendez, held a degree in economics, and primarily advised the Bank on U.S. dollar-denominated investments. The NNI unit subdirector, Armando Aguirre, also held a degree in economics. Prior to joining the Bank in 1981, Aguirre served as an economics teacher, a currency investment adviser, and a developer of accounting systems. Aguirre approved all of the NNI unit's CMO trades. The NNI unit assistant director, Monica Buentello, held a degree in international relations, had completed postgraduate course work in international commerce and analysis, and had participated in seminars on derivatives and CMOs while working at the Bank.

C.

The relationship between Epley and the Bank began in June 1992 when Epley, then an MMAR Group employee, made an unsolicited phone call to sell CMOs to the Bank. Over the next few months, Epley discussed CMOs with Buentello and others in the NNI unit. The Bank allegedly told Epley that it wished to "invest in securities that: [(1)] had low risk to capital; [(2)] were highly liquid; [(3)] would be held for short periods (generally 90-180 days); and [(4)] could reasonably be expected to provide a good yield." J.A. at 1537 (Buentello Aff.). The Bank also allegedly told Epley that it would be "beneficial if" the investments met the liquidity coefficient requirement of a Mexican banking regulation, Circular 292.**4** Id. at 1538.

Epley provided the Bank with general background materials describing the functioning and risks of CMOs. First, Epley provided the Bank with the MMAR Group Guide to CMO Structures (Group Guide). The Group Guide dedicated two pages to a description of inverse floaters and inverse IOs, calling them each volatile. Second, Epley provided the Bank with the MMAR Group Guide to Inverse

---

**4** Circular 292 requires that fifteen percent of a Mexican bank's U.S. dollar-denominated investments be in short-term, highly liquid securities.

7

IOs, which described the risks and benefits of inverse IOs.[5] Third, Epley wrote a letter to Buentello dated July 22, 1992 (risk letter), outlining four types of risks of inverse floaters: credit risk, coupon risk, price volatility, and liquidity risk. Describing the coupon risk, the risk letter stated that in "most cases" the index would need to increase by six percent before the yield of the inverse floater became zero. See J.A. at 1437. As for price volatility, the risk letter stated that the price had an inverse relationship to interest rates, "as with all fixed income securities." Id. As for liquidity risk, the letter claimed that many firms would bid on inverse floaters and that demand "currently" far exceeded supply. Id. at 1438.

During the summer of 1992, the Bank's NNI unit independently investigated the benefits and risks of CMOs. The Bank discussed the potential investment in CMOs with its counsel and established a fourteen-step review procedure to be followed prior to each CMO purchase. The review procedure was later formalized into a written manual. See J.A. at 1254-79. Buentello, with assistance from Epley, authored a lengthy analysis entitled "Banca Cremi Investment System in Inverse Floater." See id. at 643-71. The analysis concluded that inverse floaters are leveraged "to obtain extraordinary returns" of around twenty percent. Id. at 645-46.

The Bank's analysis explained that since the market for inverse floaters began, high returns and decreasing interest rates had given rise to "a more and more liquid market." J.A. at 657-58. The analysis described the interest rate structure of inverse floaters in detail, using charts and graphs to illustrate the sensitivity of inverse floaters to shifts in the index rate. Similar to Epley's risk letter, the Bank's analysis recognized that if the index rate increased by six percent, the yield of an inverse floater CMO would dwindle to nothing. The analysis noted that, "[l]ike all fixed rate securities, there is an inverse relationship between interest rates and bond price," and that interest rates ultimately "influenc[e] returns on the bonds." Id. at 649. Finally, while the analysis indicated that investments in CMOs complied with Circular 292, the Bank also reasoned that if these investments did not

_____

[5] It is not clear exactly when these brochures were provided to the Bank, but it is undisputed that both were provided prior to the purchase of the CMOs that are the subject of this suit.

8

comply with Circular 292, they would be like any other international investment. Id. at 645, 659.

Between August 1992 and August 1993, the Bank made additional efforts to refine its knowledge of CMO investing. In October 1992 NNI unit director Mendez purchased several lengthy treatises that described mortgage investments and CMOs in extensive detail. These books were made available to the NNI unit staff. In May 1993 Buentello attended a seminar on derivatives investing. Buentello also attended a seminar at which CMO investing and pricing methods were discussed.

Throughout this period, the Bank was courted by other brokerage houses who sought to obtain the Bank's CMO business, and the Bank authorized the NNI unit to engage in CMO transactions with these brokerage houses. Each brokerage house provided the Bank with their own internal documents describing the benefits and risks of CMO investing. In January 1993 one of these brokerage houses forwarded to the Bank an article warning of what could occur to CMO investments if interest rates were to rise: "[i]f interest rates rise . . . what investors thought was a safe, secure medium-term maturity can suddenly be transformed into a highly risky long-term security." Randall W. Forsyth, The Pinocchio Security: Here's the Awful Truth About CMOs, Barron's, Jan. 18, 1993, at 15. The article suggested that, in these circumstances, a CMO's price would drop ten to twenty percent "if you can get a bid for it at all." Id. Epley indicated to the Bank that he disagreed with the Barron's article, and wrote in a letter that the risks of a CMO were "less of a concern" for an institutional investor. J.A. at 1441. Epley included a different Barron's article by Andrew Bary, who "specialize[d] in covering the institutional investor's capital markets." J.A. at 1442.**6**

_____

**6** The parties have not included this article in the record, which is referred to in Epley's letter as having been published "one month prior" to The Pinocchio Security. During that period, Bary authored only two articles on CMO investing for Barron's, and both were critical of CMOs. The first article reasoned that "[i]nstitutional demand" had helped the CMO market grow, despite the fact that "liquidity remains notoriously poor," even for large institutional investors. Andrew Bary, Capital Markets: Trading Points, Barron's, Nov. 23, 1992, at 48. In the other, Bary

9

The Bank purchased its first CMO in August 1992. For the next year and a half, the Bank purchased a total of twenty-nine CMOs. Epley was in continual contact with the Bank during its period of CMO trading. Epley sent numerous faxes and letters to the Bank encouraging the Bank to make additional CMO purchases. Most of these suggested purchases were not pursued by the Bank. Epley introduced the NNI unit to a leading CMO expert and finance professor, Frank J. Fabozzi. Fabozzi was made available to the Bank for technical consultation and sent the Bank textbooks he had written which described CMOs and other financial instruments. Additionally, on request, Alex. Brown would perform a "portfolio analysis" of the Bank's holdings.[7] Prior to each CMO purchase, Epley provided the Bank with the yield matrix for that CMO. The yield matrix set forth the formula of the CMO's floating interest rate. It also provided a table that indicated how the CMO's yield and average maturity changed when interest rate and prepayment conditions changed. Although the yield matrix indicated the average maturity of the CMO, it did not specify the formula that was used to calculate the precise maturity of the CMO.

_____

explained that "[w]hen rates fall, the yield on the inverse floater jumps, and when rates rise, the yield on the inverse floater plunges . . . resulting in a sharp drop in the security's price." Andrew Bary, Capital Markets: Trading Points, Barron's, Dec. 14, 1992, at 54. Bary asked:

> How did an opportunity exist to buy federal-agency mortgage securities yielding 20%? Because most portfolio managers . . . were afraid of the price volatility of inverse floaters.

Id. Bary concluded that "[i]f a broker offers one, it pays, of course, to be very careful," in part, because "[e]ven mortgage experts have a hard time valuing them." Id.

**7** The Bank only requested one such analysis, which was performed by Alex. Brown in July 1993. Alex. Brown's analysis provided a table that showed the sensitivity of the price of each CMO the Bank owned to interest rate changes. The July 1993 analysis indicated that, of the three types of CMOs the Bank held at that time, the prices of both its inverse floaters and its inverse IOs were more sensitive to interest rate changes than its PACs.

10

The CMOs initially earned interest at rates as high as twenty-four percent. The Bank played the CMO market aggressively, trading CMOs frequently to take advantage of short-term market swings. The Bank sold eight CMOs within three weeks of purchasing them, including one trade made within twenty-four hours of the Bank's purchase. The Bank sold a total of twenty-three CMOs, each at a profit, prior to the CMO market downturn in March 1994. The aggregate price of these twenty-three CMOs exceeded $96 million. The Bank's profits exceeded $2 million.

Alex. Brown never charged the Bank a commission for the Bank's CMO purchases. Rather, Alex. Brown purchased the securities and then sold them to the Bank with a markup. The Bank never asked Epley or Alex. Brown what markup it placed on the CMOs, and Alex. Brown never disclosed the amount of markup. Although Alex. Brown found purchasers for each of the twenty-three CMOs sold by the Bank, Alex. Brown never charged the Bank a markdown on the sales.

The Bank held six CMOs at the time of the market downturn in March 1994.**8** These six CMOs are the subject of the instant suit. After the market downturn in February 1994, the price of the six CMOs dropped precipitously. The Bank claims losses on the six CMOs of around $21 million of the original purchase price of around $40 million.**9**

The Bank filed a complaint for securities fraud against Epley and

_____

**8** These include: (1) FN 93-169 SC, an inverse floater purchased on August 31, 1993, for approximately $8 million; (2) FN 93-203 SA, an inverse floater purchased on September 23 and 28, 1993, for approximately $10.1 million; (3) FN 93-210 SD, an inverse floater purchased on December 6, 1993, for approximately $9.1 million; (4) FHLMC 1676 S, an inverse floater purchased on January 24, 1994, for approximately $4.6 million; (5) FNR 94-29 SD, an inverse floater purchased on February 2, 1994, for approximately $4.9 million; and (6) FHR 1711 S, an inverse IO purchased on March 4, 1994, for approximately $6.1 million.

**9** The Bank's CMO losses were only the beginning of its troubles. Later in 1994, the Bank's chairman disappeared with $700 million of the Bank's assets, leading the Bank to be put into receivership by Mexican banking authorities.

Alex. Brown in the United States District Court for the District of Maryland. The Bank claimed that Epley and Alex. Brown violated § 10(b) and Rule 10b-5 by: (1) making material misstatements and omissions regarding the CMOs sold to the Bank; (2) selling the Bank the CMOs which it knew to be unsuitable investments for the Bank; and (3) failing to disclose fraudulently excessive markups totaling $2 million on the CMO sales. The Bank also claimed violations of the Maryland Securities Act, common law breach of fiduciary duty, negligence, negligent misrepresentation, and fraud.

In support of their claim that Epley and Alex. Brown made numerous material omissions and misstatements, the Bank alleged that Epley and Alex. Brown failed to provide the Bank with material information about the functioning of each of the CMOs, including: (1) the impact of interest rates on CMO price; (2) the precise principal repayment priority; and (3) the impact of interest rates on CMO liquidity. The Bank also alleged that the defendants failed in their duty to provide: (1) information normally included in a CMO prospectus[10]; (2) sophisticated computer software to reverse engineer new issue CMOs to reveal their performance in various market conditions; (3) information regarding the CMOs' qualification under Mexico's Circular 292; and (4) information regarding the CMOs' qualification under U.S. banking regulations. The Bank also alleged that Epley and Alex. Brown made material misstatements when they: (1) downplayed the impact of a change in interest rates on CMO prices by comparing it to that of other fixed income securities; (2) stated that demand for CMOs currently far exceeds supply; (3) claimed that CMOs had relatively low risk levels; (4) claimed that the inverse IOs sold to the Bank had a self-hedging feature; and (5) told the Bank that the criticisms in the Barron's Pinocchio Security article should be less of a concern for institutional investors than for individual investors.

After discovery, the district court granted summary judgment to Epley and Alex. Brown on all claims. The district court concluded that the Bank had failed to raise a genuine issue of material fact as

_____

[10] The Bank does not claim that a prospectus, itself, should have been provided. In fact, it is unclear whether prospectuses for the CMO tranches existed at the time of their purchase.

12

to three of the four elements that must be proved to establish a violation of § 10(b). First, the district court reasoned that Epley and Alex. Brown had made no material omissions or misstatements regarding the risks of the CMOs because they made general disclosures of yield, price, and liquidity risks. Further, the district court found that the Bank's allegation that scienter existed because Epley and Alex. Brown encouraged purchases in order to earn excessive markups to be based only on speculation. Finally, the district court concluded that several factors, including the Bank's size and its sophistication and the expertise of the NNI unit employees, did not allow the Bank to justifiably rely on any misstatements that Epley and Alex. Brown might have made.[11]

The district court rejected the Bank's suitability claim as a subset of the rejected § 10(b) claim. The district court also rejected the Bank's claim that the markups were excessive, concluding that most of the markups were within standards provided by the National Association of Securities Dealers (NASD), and that no evidence had been submitted to establish that the higher markups were not justified by special circumstances.

The district court also rejected the Bank's state law claims, holding that the Maryland Securities Act did not apply to Alex. Brown because it was a broker-dealer, and that, based on either Texas or Maryland state law, the Bank's tort claims failed as a matter of law. The Bank appeals the district court's grant of summary judgment.

II.

We review the district court's grant of summary judgment de novo. See Myers v. Finkle, 950 F.2d 165, 167 (4th Cir. 1991). To defeat the motion for summary judgment, the Bank must raise a genuine issue of material fact as to each element essential to its case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A factual issue raised by the Bank is only genuine if a reasonable jury could return a verdict for the Bank on each element necessary to its case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

_____

[11] The district court did not address proximate causation, the final element of a § 10(b) claim.

13

To establish liability under § 10(b), the Bank must prove that "(1) the defendant[s] made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." Cooke v. Manufactured Homes, Inc., 998 F.2d 1256, 1260-61 (4th Cir. 1993) (quotations and citation omitted). In this case, the Bank has failed to present evidence that would permit a reasonable jury to find that the Bank justifiably relied on any omissions or misstatements made by Epley and Alex. Brown.[12]

A.

A dissatisfied investor cannot recover for a poor investment on the basis of a broker's alleged omission or misstatement where, "through minimal diligence, the investor should have discovered the truth." Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1032 (2d Cir. 1993). Because the justifiable reliance requirement "requir[es] plaintiffs to invest carefully," it "promotes the anti-fraud policies" of the securities acts by making fraud more readily discoverable. Dupuy v. Dupuy, 551 F.2d 1005, 1014 (5th Cir. 1977). A plaintiff's failure to prove that it justifiably relied on a broker's alleged omission or misstatement is necessarily fatal to a securities fraud claim. See Myers, 950 F.2d at 167.[13]

An investor's reliance on a broker's omission or misstatement is never justified when the "investor's conduct rises to the level of recklessness." Brown, 991 F.2d at 1032.[14] A plaintiff is reckless if he "in-

_____

**12** Because the Bank cannot show justifiable reliance, its § 10(b) action fails as a matter of law and we need not address the district court's other grounds for granting summary judgment against the plaintiff on this claim.

**13** Courts often infer reliance when a plaintiff alleges that the defendant made a material omission, see Carras v. Burns, 516 F.2d 251, 257 (4th Cir. 1975), requiring the defendant to rebut the inference by proving the lack of reliance. See id. No presumption of reliance exists, however, "when the plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure." Cox v. Collins, 7 F.3d 394, 395-96 (4th Cir. 1993).

**14** Indeed, courts traditionally have held that reliance is not justified when the investor was merely negligent. See Royal Am. Managers, Inc.

14

tentionally refuse[s] to investigate in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." Dupuy, 551 F.2d at 1020 (quotations and citation omitted). Stated differently, a plaintiff is reckless if he "possesses information sufficient to call [a mis-] representation into question," but nevertheless "close[s] his eyes to a known risk." Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 530 (7th Cir. 1985) (citation omitted). Thus, "[i]f the investor knows enough so that the lie or omission still leaves him cognizant of the risk, then there is no liability." Id.

This Court weighs eight factors to determine whether an investor is justified in relying on a material omission or misstatement:

> (1) the sophistication and expertise of the plaintiff in financial and securities matters;

> (2) the existence of long standing business or personal relationships;

> (3) access to relevant information;

> (4) the existence of a fiduciary relationship;

> (5) concealment of the fraud;

> (6) the opportunity to detect the fraud;

> (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and

_____

v. IRC Holding Corp., 885 F.2d 1011, 1015 (2d Cir. 1989). Many federal courts reconsidered the negligence standard after the Supreme Court, in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976), held that a person could only be liable under § 10(b) for intentional conduct. See Dupuy v. Dupuy, 551 F.2d 1005, 1017-20 (5th Cir. 1977). At least one court has apparently retained the negligence standard. See Straub v. Vaisman & Co., 540 F.2d 591, 598 (3d Cir. 1976) ("The obligation of due care must be a flexible one, dependent upon the circumstances of each case. We require only that the plaintiff act reasonably.").

15

(8) the generality or specificity of the misrepresentations.

Myers, 950 F.2d at 167 (quotations and alteration omitted). No single factor is dispositive of whether reliance is justified. Id. The first Myers factor, the sophistication of the investor, has long been a critical element in determining whether an investor was entitled to § 10(b) relief. See Kohler v. Kohler Co., 319 F.2d 634, 642 (7th Cir. 1963) (considering an investor's "business acumen" and access to "extrinsic sources of sound business advice" to conclude there was no reliance, although the transaction might not have been fair if the investor "had been a novice"); List v. Fashion Park, Inc., 340 F.2d 457, 463-64 (2d Cir. 1965) (no reliance where investor was "an experienced and successful investor in securities" who did not ask his broker for information regarding the claimed omission). A sophisticated investor requires less information to call a "[mis-]representation into question" than would an unsophisticated investor. Angelos, 762 F.2d at 530. Likewise, when material information is omitted, a sophisticated investor is more likely to "know[ ] enough so that the . . . omission still leaves him cognizant of the risk." Id.

When an investor is an individual, this Court looks to several factors to determine if the investor is sophisticated, including "wealth[,] . . . age, education, professional status, investment experience, and business background." Myers, 950 F.2d at 168. Some of these factors may not be perfectly suited for application to an institutional investor. Cf. C. Edward Fletcher, Sophisticated Investors Under the Federal Securities Laws, 1988 Duke L.J. 1081, 1149-53 (reviewing factors gauging sophistication of individual investors, and concluding that there should be a "conclusive presumption" that all institutional investors are sophisticated). However, the factors which are relevant to an institution strongly support the sophistication of the Bank. The Bank, with assets of $5 billion, is unquestionably wealthy. In addition, while the Bank's investment choices may have been unwise, its investment experience is extraordinary, and far surpasses most sophisticated individual investors. As a business entity, the Bank obviously has a business background, and its employees--hired for their business expertise--had extensive education and experience in economics and finance.**15**

_____

**15** The NASD has also promulgated factors specifically designed to measure the sophistication of institutional investors. Order Approving

16

Despite its extensive investment experience and extraordinary resources, the Bank nevertheless contends that, while it may be sophisticated in certain types of investments, it was not sophisticated in CMO investments. See, e.g., McAnally v. Gildersleeve, 16 F.3d 1493, 1500 (8th Cir. 1994) (recognizing that an individual's sophistication in "stocks and bonds" did not necessarily suggest sophistication in commodities futures options); Order Approving NASD Suitability Interpretation, 61 Fed. Reg. 44,100, 44,112 (1996) (NASD Fair Practice Rules) (in approving NASD fair practice rules, SEC recognized that even a sophisticated institutional investor may not be capable of understanding a "particular investment risk"). The Bank argues that deposition testimony of its employees and an expert witness that the Bank was unsophisticated in CMO investments created a genuine issue of fact.

We reject this argument. The Bank's NNI unit, whose function was to invest Bank funds in dollar-denominated investments, employed three well-educated investment professionals to select a sound, but profitable, investment strategy. Mendez, Aguirre, and Buentello conducted a thorough, independent investigation of the benefits and risks of CMO investments by attending seminars, purchasing treatises on the subject, and developing a multi-step review process for each CMO investment. Rather than blindly relying on Epley and Alex. Brown, the record shows that the Bank rejected Epley's suggested investments far more often than it accepted them. Indeed, the Bank consulted with five other brokerage houses regarding CMO investments, and each of these brokerage houses gave the Bank detailed information describing the benefits and the risks of CMO investments. After a year of trading in CMOs, the Bank displayed a knowledge and an aggressiveness that belie its current claim that it did not understand CMO investments. See J.A. at 447-48 (indicating dramatic price changes over short time periods for many of the Bank's profit-

───────────────────────────────────────────────

NASD Suitability Interpretation, 61 Fed. Reg. 44,100, 44,112 (1996). The two most important factors are an institutional investor's "capability to evaluate investment risk independently, and the extent to which the [investor] is exercising independent judgment." Id. at 44,105. In light of the undisputed record, it is clear that the Bank would also qualify as a highly sophisticated institutional investor under the NASD standards.

able CMO trades: FNMA 92 112 SC was sold after one day at a profit reflecting an annual increase of over 350%; FN 93-115 SB was sold after two weeks at a profit reflecting an annual increase of around 58%; FNMA 1992 162 SB was sold after two weeks at a profit reflecting an annual increase of around 38%); NASD Fair Practice Rules, 61 Fed. Reg. at 44,105 n.20 ("[An institution] who initially needed help understanding a potential investment may ultimately develop an understanding and make an independent investment decision."). Accordingly, we agree with the district court that the Bank was a "sophisticated investor" for the purposes of this case. See Banca Cremi v. Alex. Brown, 955 F. Supp. 499, 515 (D. Md. 1997).

The second Myers factor also lends no support to the Bank's claim of justifiable reliance. There is no evidence in the record that the Bank enjoyed a long-standing business or personal relationship with Epley or Alex. Brown, and the undisputed evidence strongly supports the lack of any such relationship. The Bank began purchasing CMOs a mere two months after first being "cold called" by Epley, and the conduct of the Bank--consulting with competing brokerage houses and rejecting most of Epley's recommendations--suggests that the Bank dealt with Epley and Alex. Brown at arm's length. Accordingly, this is not a situation where the defendants could have "exploited the business relationship [with the plaintiff] knowing that [the plaintiff] was not likely to investigate the merits of [the defendants'] recommendation." Straub v. Vaisman & Co., 540 F.2d 591, 598 (3d Cir. 1976) (quotations omitted).**16**

The third, fifth, and sixth Myers factors look to whether the Bank

_____

**16** Relying on innuendo and veiled suggestions, the Bank apparently contends that Buentello and Epley had a sexual relationship, and that Epley and Alex. Brown exploited that relationship. We first note that an appellate brief is not a paperback romance novel, where tawdry goings-on can be hinted at with a smirk and a wink; if the Bank had a point to make with its innuendo, we would have preferred that it were clear about it. As there is not a shred of evidence in the record to support the Bank's salacious suggestions, and even less evidence to suggest that this hinted-at relationship had any effect on Buentello's business decisions, we find it unfortunate that the Bank found it necessary to tarnish the reputations of the opposing party and its own employee.

had access to the relevant information on CMOs, whether Epley and Alex. Brown concealed the alleged fraud, and whether the Bank had an opportunity to detect the fraud. In this case, there is no allegation that Epley or Alex. Brown concealed specific risks of individual investments, but rather that they misrepresented the risks associated with an entire field of investment. Clearly, the Bank--through its independent research, contacts with other brokerage houses, and discussions with Epley and Alex. Brown--not only had access to, but actually possessed more than sufficient information to make it aware of the substantial risks of investing in CMOs. The Bank knew that, although it could enjoy substantial earnings from CMO investments if interest rates decreased or remained the same, any increase in interest rates could wreak havoc on its CMO investment strategy. The Bank also knew that more sophisticated analyses of its CMO portfolio was available, such as the price analysis performed by Alex. Brown on the Bank's portfolio in July 1993. The July 1993 price analysis indicated that both inverse floaters and inverse IOs were more sensitive to interest rate increases than other types of CMOs, not to mention other more conservative fixed-rate investments such as U.S. Treasury Bonds. Despite possessing this information, the Bank purchased the six CMOs and never requested any analysis either before or after purchase.

The fourth Myers factor, whether the defendants owed a fiduciary duty to the plaintiff, is also not implicated in this case. As will be discussed below, see infra, § V, Epley and Alex. Brown were not the agents of the Bank, but rather interacted with the Bank at arm's length in principal-to-principal dealings, and no common law fiduciary duty was ever created.

The seventh Myers factor looks to whether the Bank initiated or sought to expedite the transaction. While the Bank had sufficient time to review each of its CMO purchases, and evidenced independent decision-making by rejecting numerous suggested purchases by Epley and employing elaborate procedures to review each suggested purchase, it was Epley who initially suggested these investments to the Bank. Accordingly, we agree with the Bank that this factor lends some support to its argument for justifiable reliance. But see Chance v. F.N. Wolf & Co., No. 93-2390, 1994 WL 529901, at *6 (4th Cir. Sept. 30, 1994) (unpublished, table decision reported at 36 F.3d 1091)

19

(defendant entitled to judgment as a matter of law on justifiable reliance despite fact that defendant "initiated all of the stock transactions").

The final <u>Myers</u> factor looks to whether the misrepresentations were general or specific. The Bank argues, and we agree, that the defendants' alleged misstatements were general. Contrary to the Bank, however, we conclude that a general statement creates <u>less</u> justifiable reliance than would a specific statement. <u>See Hillson Partners Ltd. Partnership v. Adage Corp.</u>, 42 F.3d 204, 215 (4th Cir. 1994) (explaining that investor is more justified in relying on specific predictions); <u>Zobrist v. Coal-X, Inc.</u>, 708 F.2d 1511, 1518 (10th Cir. 1983) (noting that there is no "valid reason" to rely on general misrepresentations as to risk when more specific warnings have been provided); <u>Hughes v. Dempsey-Tegeler & Co.</u>, 534 F.2d 156, 177 (9th Cir. 1976) (sophisticated investor was not justified in relying on general positive comments regarding investment risks). Epley's general positive statements concerning CMOs did not justify reliance when the Bank possessed a variety of resources, including investment-specific yield and average life tables, scholarly works, and an article published in a popular business journal explaining in great detail the workings and risks of CMOs.

In sum, in this case the Bank had access to an extraordinary wealth of information regarding CMOs. With few exceptions, the depth and breadth of this information illustrated one overriding point: investments in CMOs, while potentially very profitable, were undoubtedly highly risky. As a sophisticated business entity handling five billion dollars of other people's money, the Bank had the advice of its own employees and a horde of the defendants' competitors. Nevertheless, the Bank invested in CMOs through arm's length dealings with the defendants. While the vast majority of these investments were profitable for the Bank, a half-dozen proved disastrously timed,[17] and the

---

[17] The Bank has never alleged that the defendants had any reason to believe that the CMO market would collapse when it did. Indeed, in a meeting at which Buentello discussed its CMO losses, the Bank concluded that the CMO price drop was caused by the "totally unpredictable situation [of an increased estimate of U.S. GNP] and the unprecedented

20

Bank now alleges that its misfortune resulted from its justifiable naivete in listening to the defendants' purported lies.

As in any "action[ ] for fraud, reliance on false statements must be accompanied by a right to rely." Foremost Guar. Corp. v. Meritor Sav. Bank, 910 F.2d 118, 125 (4th Cir. 1990). Here, the Bank lost its right to rely by its own recklessness. The Bank continued to purchase CMOs after it had sufficient information, given its sophistication, to be well apprised of the risks it would face were interest rates to rise. Given that the Bank was aware of the risks involved in investing in CMOs, the Bank was not justified in relying on Epley and Alex. Brown's alleged omissions and misstatements. Accordingly, we affirm the district court's grant of summary judgment against the Bank on this claim.

B.

The Bank next contends that Epley and Alex. Brown learned that CMO investments did not comply with the requirements of Mexican Circular 292 and U.S. banking regulations, but failed to inform the Bank of this. Because the defendants allegedly had a duty to the Bank to inform them of this understanding of Mexican and United States law, the Bank contends that the Bank justifiably relied on this omission. Because the Bank contends that it would not have invested in the CMOs had it possessed this information, the Bank contends that the omission was material and caused its investment losses.

While the plaintiff has presented a very creative claim, it is not a meritorious one. Any non-reckless Mexican bank attempting to interpret Mexican banking regulations would turn to Mexican lawyers or

_____

move by the Fed to increase short-term rates in a preventative fashion." J.A. at 458. In light of this recognition by the plaintiffs that their losses were caused by general market forces rather than the defendants' alleged misdeeds, it is puzzling at best on what basis the plaintiffs hoped to prove liability under § 10(b). Cf. Bastian v. Petran Resources Corp., 892 F.2d 680, 685 (7th Cir. 1990) (noting that "[d]efrauders are a bad lot and should be punished, but Rule 10b-5 does not make them insurers against national economic calamities").

21

Mexican government officials for assistance, rather than relying on an American salesman's opinion. Furthermore, while the requirements of Circular 292 are not discussed in detail by the parties, it appears undisputed that to comply, a security must have a stated maturity of less than one year. As many home mortgages have maturities of several decades, we believe that only a reckless investor would fail to recognize that investments in CMOs might not comply with Mexican law. Accordingly, even if the Bank had some legitimate, or even coherent, reason for eschewing appropriate legal assistance in interpreting Circular 292, any reliance on the defendants' silence was not justifiable. See Dupuy, 551 F.2d at 1020 (no justifiable reliance where a plaintiff "intentionally refuse[s] to investigate in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow" (quotations and citation omitted)).

III.

The Bank next claims that Epley and Alex. Brown committed § 10(b) fraud by selling securities to the Bank that the defendants knew were not suited for the Bank's investment goals. We disagree.

While this Court has never considered an unsuitability claim under § 10(b), several courts have recognized an unsuitability claim in certain circumstances. See, e.g., O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 898 (10th Cir. 1992) (recognizing two types of unsuitability claims, one based on § 10(b) fraud and one similar to churning claim); Craighead v. E.F. Hutton & Co., 899 F.2d 485, 493 (6th Cir. 1990) (recognizing unsuitability claim as a type of fraud claim); Lefkowitz v. Smith Barney, Harris Upham & Co., 804 F.2d 154, 155 (1st Cir. 1986) (per curiam) (same); Clark v. John Lamula Investors, Inc., 583 F.2d 594, 600-01 (2d Cir. 1978) (recognizing unsuitability claim).

A § 10(b) unsuitability claim has five elements:

> (1) that the securities purchased were unsuited to the
> buyer's needs;

22

(2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs;

(3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway;

(4) that, with scienter, the defendant made material misrepresentations (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and

(5) that the buyer justifiably relied to its detriment on the defendant's fraudulent conduct.

Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1031 (2d Cir. 1993) (emphasis added). A claim for § 10(b) suitability fraud "is a subset of the ordinary § 10(b) fraud claim." Id.; see also O'Connor, 965 F.2d at 897 (Court recognizing that this type of suitability claim could be analyzed "simply as a misrepresentation or failure to disclose a material fact. In such a case, the broker has omitted telling the investor the recommendation is unstable for the investor's interests. The court may then use traditional laws concerning omission to examine the claim." (citation omitted)).

Because the Bank's suitability claim is a "subset" of the Bank's § 10(b) claim, we conclude that it must fail for the same reason: lack of justifiable reliance. The Bank had sufficient information concerning the risks of CMOs to render unjustified any reliance on a recommendation that the securities were suitable investments. Yield tables apprised the Bank that inverse floaters' yield decreased and average maturity increased dramatically if interest rates increased. In light of its sophistication, the Bank must be presumed to have been aware that, were interest rates to increase, there would be substantial "risk to capital," contrary to one of its stated goals. **18**

_____

**18** For example, the yield table for one of the six CMOs, FN 93-210 SD, indicates that a one point increase in interest (accompanied, as the table suggests, by a reduction in prepayments) would convert a security maturing in 3.8 years and yielding 14.8 percent interest into a security maturing in 16.11 years and yielding only 7.42 percent interest. Naturally, an investor as sophisticated as the Bank would understand that the result of this change would be a dramatic fluctuation in the market price of the security.

23

Similarly, the Bank knew that CMOs were a new product whose demand had grown because the market remained strong, and knew that a Barron's article had warned that an interest rate increase might lead to liquidity problems. Thus, given the Bank's sophistication, it must have been aware that if interest rates increased, its CMOs might not remain "highly liquid," contrary to another of the Bank's stated goals.

Finally, the Bank was apprised in the yield tables that the average maturity for each of the CMOs was well in excess of the "90-180 days" it claims as its investment goal. Given the Bank's sophistication, it must have understood that it might have to hold the security for over 180 days if it did not want to accept the going market price for the CMO. See J.A. at 447-48 (Bank earned a substantial profit in selling three CMOs after holding them for over 180 days). In sum, the Bank appeared to have been most interested in its final stated goal: "good yield." The only reasonable conclusion is that the Bank itself chose its CMO investment strategy by balancing CMO risks and benefits against its four competing goals.[19] The Bank cannot now claim that its investment strategy was the result of it justifiably relying on the recommendations of Epley and Alex. Brown.

IV.

Next, the Bank contends that Epley and Alex. Brown fraudulently charged excessive markups for the CMOs purchased by the Bank, and that the district court erred in granting summary judgment on this claim. We disagree.

"A securities broker's mark-up equals the price charged to the customer minus the prevailing market price." Bank of Lexington & Trust Co. v. Vining-Sparks Sec., Inc., 959 F.2d 606, 613 (6th Cir. 1992). For

_____

[19] The Tenth Circuit also recognized a distinct type of suitability claim which arises when a broker's act of purchasing a stock is fraudulent. O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 898 (10th Cir. 1992). One element of this claim is that "the broker exercised control over the investor's account." Id. Because the Bank does not claim that Alex. Brown controlled the Bank's CMO account, this type of suitability claim is unavailable to the Bank.

24

example, where the securities purchased have a market value of $100,000 and the broker charges its customers $105,000, the markup is $5000, or five percent. Where, as in the instant case, the broker charges no commission, the markup represents the sole compensation received by the broker for the transaction.

"A mark-up is excessive when it bears no reasonable relation to the prevailing market price." Id. Factors relevant in determining reasonableness include:

> (1) the type of security involved; (2) the availability of the security in the market; (3) the price of the security; (4) the amount of money involved in a transaction; (5) disclosure; (6) the pattern of markups or markdowns; and (7) the nature of the member's business.

3C Harold S. Bloomenthal, Securities and Federal Corporate Law, App. 12.13 (Apr. 1, 1992). Although each case requires an independent analysis for determining whether a given markup is reasonable, the Board of Governors of the NASD has determined that, as a general guideline, a five percent markup is reasonable. See id.[20]

Although securities brokers are required to disclose markups in equity securities, see 17 C.F.R. § 240.10b-10(a)(2)(ii)(A) & (B), there is no requirement for a broker to disclose the amount of markup charged for a debt security in a riskless transaction. See id. The SEC once considered promulgating regulations requiring such a disclosure. See Release No. 34-15220, 15 S.E.C. Docket 1260, 1978 WL 19902 (S.E.C.) (Oct. 6, 1978), at *1. However, the SEC withdrew its proposed regulations "because [the SEC] has concluded that [the regulations] would not achieve the purposes of the proposal at an acceptable cost and that there are alternative ways of achieving the same goal with fewer adverse side effects." Release No. 34-18987, 25 S.E.C. Docket 1223, 1982 WL 35762 (S.E.C.) (Aug. 20, 1982), at *2.

---

[20] Because the reasonableness of markups is situation-specific, the NASD guideline recognizes that markups of under five percent may be excessive. See 3C Harold S. Bloomenthal, Securities and Federal Corporate Law, App. 12.13 (Apr. 1, 1992).

The SEC has brought administrative actions for fraud under 17 C.F.R. § 240.10b-5 against securities brokers who have allegedly charged excessive markups to their debt securities customers without disclosing the markups. See, e.g., Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 835 F.2d 1031, 1033 (3d Cir. 1987) (citing cases). The SEC has explained that

> [i]nherent in the relationship between a dealer and his customer is the vital representation that the customer will be dealt with fairly, and in accordance with the standards of the profession. It is neither fair dealing nor in accordance with such standards to exploit trust and ignorance for profits far higher than might be realized from an informed customer. It is fraud to exact such profits through the purchase or sale of securities while the representation on which the relationship is based is knowingly false. This fraud is avoided only by charging a price which bears a reasonable relation to the prevailing price or disclosing such information as will permit the customer to make an informed judgment upon whether or not he will complete the transaction.

Trost & Co., 12 S.E.C. 531, 535 (1942). Because the securities dealer creates this implied duty to disclose excessive markups by "hang[ing] out its professional shingle," this theory of liability is referred to as the "shingle theory" by the SEC. See Reply Br. of the Amicus Curiae SEC at 2.

In Ettinger, the Third Circuit recognized a private cause of action for a violation of this implied duty to disclose certain markups. See 835 F.2d at 1033, 1036 (failure to disclose excessive markup actionable under Rule 10b-5 despite dealer's compliance with Rule 10b-10). To date, it appears that only the Sixth Circuit has also recognized such a private cause of action. See Bank of Lexington, 959 F.2d at 614 (affirming denial of liability for alleged fraud, and concluding that "[a]lthough an undisclosed mark-up of 5 percent on municipal bonds might sometimes violate Rule 10b-5, the Bank fails to convince us that the district court clearly erred when it found that a 5 percent mark-up on the bonds sold to the Bank, without more, was not so excessive as to require disclosure"). As with all allegations of fraud under § 10(b), a plaintiff alleging a "shingle theory" failure to disclose

26

an excessive markup must present evidence to satisfy four elements: (1) a misrepresentation or omission of a material fact; (2) made with scienter; (3) upon which the plaintiff justifiably relied; and (4) which proximately caused the plaintiff's damages. See Cooke, 998 F.2d at 1260-61 (describing elements of fraud).

In the instant case, the Bank alleged that Epley and Alex. Brown charged undisclosed and excessive markups on nineteen CMO transactions.[21] These included two markups of 5.25 percent, one markup of 4.99 percent, seven markups of between 3.1 percent and 3.77 percent, seven markups of between 2.4 percent and 2.84 percent, and two markups of 2.06 percent and 1.78 percent, respectively. In brokering over $100,000,000 in CMOs to the Bank, Epley and Alex. Brown received some $2,000,000 in markups.

Although all but two of the markups in the instant case were below the NASD's five percent guideline, the SEC contends that "there is no safe harbor of five percent for markups on any securities," Reply Br. of Amicus Curiae SEC at 11, and the Bank alleges that all nineteen of the markups were excessive. To support its allegation of excess, the Bank proffered a well-compensated expert witness who testified that any markup of more than one percent was excessive. See J.A. at 1758 (James I. Midanek Dep. (Sept. 12, 1996) at 205).[22]

By presenting expert testimony that Epley and Alex. Brown's markups between 1.77 percent and 5.25 percent were excessive, the Bank contends that it has met its burden of resisting a summary judgment motion. Because the Bank has presented a "prima facie" case of excessive markups, the Bank asserts that "the burden of proof shifts

_____

[21] It appears that some of these transactions may have taken place while Epley was with his previous employer, MMAR Group. Because we conclude that no fraudulent markups have been proven by the Bank, we need not distinguish between those transactions involving both defendants and those transactions involving only Epley.

[22] Mr. Midanek, who holds a bachelor's degree in accounting, acknowledged that he received $450 per hour for his testimony on behalf of the Bank. See J.A. at 1593 (James I. Midanek Report at 4).

27

to the broker to show that the markups were reasonable." Appellants' Br. at 45.**23**

Because the markups in the instant case were undisclosed and allegedly excessive, the SEC, as amicus, contends that these omissions were necessarily material. See Br. of Amicus Curiae SEC at 17 ("Because a reasonable investor in making his investment decision would consider it important that he was being charged an excessive markup, the Commission has long held that such a markup is material as a matter of law."). Further, because this case involves an omission rather than a misstatement, the Bank contends that reliance can be presumed. See Appellants' Reply Br. at 21; see also Edens v. Goodyear Tire & Rubber Co., 858 F.2d 198, 207 (4th Cir. 1988) ("where fraudulent conduct involves primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery" (quotations and citation omitted)). Finally, the Bank contends that the scienter requirement is satisfied "[w]hen a dealer knows the prevailing market price and the price it is charging the customer and knows or recklessly disregards the fact that this markup is excessive." Appellants' Reply Br. at 21 n.33 (quoting Meyer Blinder, 50 S.E.C. 1215, 1230 (1992)).**24**

In summary, the Bank argues that securities dealers have an inferred duty to disclose certain markups, despite the SEC's specific decision not to require such disclosures through regulations. Dissatis-

_____

**23** The Bank cites First Honolulu Sec., Inc., 51 S.E.C. 695 (1993), in which the SEC declared:

> The NASD, as proponent of the issue, had the burden of introducing prima facie evidence of the excessiveness of the markups. The NASD met this burden by presenting evidence that the transactions at issue existed, the size of the transactions, the nature of the securities, the prices paid by Applicants contemporaneously, and the prices charged to the customers. Once the NASD presented evidence of the markups, the burden shifted to Applicants to refute this evidence.

Id. at 701 n.23.

**24** The element of proximate cause and damages is also automatically satisfied in a "shingles theory" claim because the funds that went to the dealer for the allegedly excessive markup would have been retained by the customer had the customer known that the markup was excessive.

28

fied customers who feel that an undisclosed markup is excessive, including a markup of well under the NASD five percent guideline, may bring a private cause of action for fraud based on a dealer's failure to meet this inferred duty to disclose. Once a plaintiff presents an expert witness's testimony that the markup charged is excessive, the burden shifts to the defendant to prove that he did not commit fraud. To the extent of defeating a summary judgment motion, every element of fraud--materiality, reliance, scienter, and proximate cause of damages--is inferred or can be presumed. In other words, once a markup exceeds the amount that a paid expert witness, after the fact, declares excessive, a defendant must proceed to trial to prove that he did not commit fraud.

We are acutely uncomfortable with this scheme. If the state of the law were actually as the Bank and the SEC contend, it is unthinkable that any dealer would ever fail to disclose any markup, no matter how minimal, and thereby risk a lawsuit that would inevitably lead to the expense and notoriety of a jury trial. Indeed, the SEC acknowledges that this is the only practical alternative that dealers would have. See Reply Br. of Amicus Curiae SEC at 11 ("a broker-dealer in doubt over whether a markup is proper may protect itself by making such a disclosure"). It is puzzling why, if Rule 10b-5 always imposed this requirement to disclose on dealers, the SEC considered amending Rule 10b-10 to impose a preexisting requirement. See Release No. 34-15220, 15 S.E.C. Docket 1260, 1978 WL 19902 (S.E.C.), at *1. It is even more puzzling why the SEC, having once abandoned an effort to administratively require such disclosures, should now seek to judicially impose the identical requirements on dealers. See Release No. 34-18987, 25 S.E.C. Docket 1223, 1982 WL 35762 (S.E.C.), at *2.

Assuming that a private cause of action is available to the Bank, we must reject the Bank's suggestion that the burden of proof in this case should shift to the defendant. As the facts of the instant case demonstrate, it is very easy to accuse someone of fraud, and it is clear that the mere accusation of fraud can be damaging to a defendant's reputation. A plaintiff alleging fraud has both a heavy burden of pleading fraud with particularity, see Fed. R. Civ. P. 9(b),[25] and in

_____

[25] As was explained by our sister circuit in Parnes v. Gateway 2000, Inc., there are three reasons for Federal Rule of Civil Procedure 9(b)'s heightened burden of pleading in fraud cases:

29

proving each element of the cause of action. <u>See, e.g.</u>, <u>White v. National Steel Corp.</u>, 938 F.2d 474, 490 (4th Cir. 1991) (In case of fraud, "plaintiffs carry an unquestionably heavy burden of proof. The existence of actual fraud is not deducible from facts and circumstances which would be equally consistent with honest intentions. In sum, a presumption always exists in favor of innocence and honesty in a given transaction and the burden is upon one who alleges fraud to prove it by clear and distinct evidence." (quotations, citations, and alteration omitted) (applying West Virginia law)). In the instant case, the plaintiff has failed to meet this burden.

While reliance can often be inferred in a failure-to-disclose case, <u>see Edens</u>, 858 F.2d at 207, that inference has been rebutted in the instant case. See <u>Carras v. Burns</u>, 516 F.2d 251, 257 (4th Cir. 1975) (inference of reliance is rebuttable). An economist for the Bank, NNI unit director Mendez, explained why the defendants' markup was unimportant to the Bank:

> Q[uestion by counsel]: Was Alex Brown the counter party in these transactions?
>
> A[nswer by Mendez]: Yes, of course.
>
> Q. Did you know what the difference was between their purchase price and their sales price?
>
> A. No.

---

> First, it deters the use of complaints as a pretext for fishing expeditions of unknown wrongs designed to compel <u>in terrorem</u> settlements. Second, it protects against damage to professional reputations resulting from allegations of moral turpitude. Third, it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense.

122 F.3d 539, 549 (8th Cir. 1997) (quotations and citations omitted). These same principles support our decision that a plaintiff alleging fraud should retain the burden of proof.

30

Q. And you never asked?

A. No.

Q. Because as is true of all these other investments made during this period of time, that's not consistent with business practice?

A. That's correct.

Q. Because you satisfy yourself with respect to the cost to you?

A. To the price that we were buying it for from Alex Brown.

J.A. at 272-73 (Mendez Dep. (Feb. 29, 1996) at 56-57 (emphasis added)). NNI unit subdirector Aguirre, also an economist, agreed with director Mendez's appraisal:

Q[uestion by counsel]: [J]ust to be clear, Banca Cremi was accustomed to dealing with some transactions in which the intermediary made a profit on the purchase and sale instead of charging a commission?

A[nswer by Aguirre]: I believe that this is something that would not be valid for only an institution like Cremi, but for any type of institution.

Q. That in some markets people act as principals for profits, rather than agents for commissions?

A. You see it daily. That's a daily activity in any exchange market.

Q. In that circumstance, is Banca Cremi's interest in seeing that the price it pays, if it's buying, or the price it sells for, if it's selling, is a price it believes is reasonable?

31

A. Well, I find that to be actually a very complex question. You rest, and you have to take into consideration the expertise within each area and each field where your operators are operating. I couldn't ask whether the price is good, whether it was bad, and I couldn't do any exchange operation. There are hundreds of them that are transacted daily.

Q. And the experience and expertise of the person you're dealing with is also germane to what they charge. Correct?

A. Again, let me tell you: This is something--it's a daily activity in the markets, whether the profit was large or whether it was small.

J.A. at 241-42 (Aguirre Dep. (Feb. 28, 1996) at 85-86). The district court accurately summarized this testimony in noting that

> as a matter of general policy, the Bank did not inquire about, or express any concern about the amount of any markups. According to the deposition testimony of Aguirre and Mendez, so long as the Bank believed the total price of an investment transaction was acceptable, the amount of the broker's markup was not a consideration in its decision to invest.

Banca Cremi, 955 F. Supp. at 518 (citing Aguirre Dep. at 84-86; Mendez Dep. at 56-57).

In this case, it is clear that the Bank did not rely on any shingle-created presumption that the defendants were charging an undefined "fair" rate of markup. Rather, the Bank was uninterested in the defendants' income, and instead based its trading decisions solely on the purchase prices of the CMOs. Given the state of the record and the utter lack of proof that a disclosed markup would have mattered, we conclude that the Bank's excessive markup claim must fail.**26**

_____

**26** We also note that the alleged presumption of scienter in the instant case is rather difficult to square with the uncontested fact that Epley and Alex. Brown stayed within the NASD five percent guideline on all of the

32

V.

Finally, the Bank argues that the Bank's state law statutory and tort claims for breach of fiduciary duty, fraud, negligence, and negligent misrepresentation necessarily raise factual questions for a jury to decide, and that the district court erred in granting summary judgment. We conclude that the Bank's state law claims fail as a matter of law, and accordingly affirm the district court's grant of summary judgment.

We review the district court's interpretation of state law de novo. See Salve Regina College v. Russell, 499 U.S. 225, 231 (1991). This Court must follow the forum state's choice of law rules to determine which state's substantive law to apply. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). In this case, Maryland, the forum state, adheres to the lex loci delictus rule--the place of the wrong--for determining which state's tort law should be applied. See Chambco v. Urban Masonry Corp., 659 A.2d 297, 299 (M.D. App. 1995). Because the alleged wrongdoing of the defendants occurred in Houston, Texas, we conclude that a Maryland court would apply the law of Texas to the Bank's tort claims. See Farwell v. Un, 902 F.2d

---

markups with only two exceptions, and in each of these charged only .25 percent above the guideline range. Scienter exists "if the defendant knew the statement was misleading or knew of the existence of facts which, if disclosed, would have shown it to be misleading." Carras v. Burns, 516 F.2d 251, 256 (4th Cir. 1975) (quotations and citations omitted). In light of the defendants' adherence to an industry-wide guideline, the plaintiff has rather a heavy burden to persuade that the defendants nevertheless knew that their markups were fraudulently excessive. Cf. Decision by National Business Conduct Committee of NASD, District Bus. Conduct Comm. v. MMAR Group, Inc., (Oct. 22, 1996) at 14, reprinted in Appellees' Add. at 33 ("Generally, in litigated cases, the [SEC] has not found mark-ups or mark-downs of less than 4% to be excessive, and has not found mark-ups or mark-downs of less than 7% to be fraudulent, regardless of the size of the transaction. . . . We do not suggest that we therefore may never find mark-ups below 4% to be excessive or mark-ups below 7% to be fraudulent. Rather, we believe that these factors should be considered in light of respondents' arguments regarding lack of notice in the particular circumstances of this case.").

33

282, 286-87 (4th Cir. 1990) (applying Maryland choice of law, and concluding that Delaware substantive law applied where allegedly negligent psychiatric care occurred in Delaware and suicide allegedly caused by negligent care occurred in Pennsylvania); Sacra v. Sacra, 426 A.2d 7, 9 (M.D. App. 1981) (applying substantive law of Delaware in wrongful death case where automobile collision in Delaware propelled vehicle over state-line into Maryland where impact with utility pole caused death).

Under Texas law, for Epley and Alex. Brown to be liable in tort for a breach of fiduciary duty, they must first have owed a fiduciary duty to the Bank. See Duncan v. Lichtenberger, 671 S.W.2d 948, 953 (Tex. App. 1984). "Fiduciary relationships arise when a party occupies a position of confidence toward another." Miller-Rogaska, Inc. v. Bank One, 931 S.W.2d 655, 663 (Tex. App. 1996). "A fiduciary duty is an extraordinary one and will not lightly be created. . . . Although a fiduciary duty may be imposed on relations outside the traditional ones, the exact same requirements necessary to establish a traditional fiduciary relation must be met to establish an informal fiduciary relation." Gillum v. Republic Health Corp., 778 S.W.2d 558, 567 (Tex. App. 1989). Because "the relationship between agent and principal is a fiduciary relationship," Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc., 794 F.2d 198, 200 (5th Cir. 1986) (quotations, citation, and alteration omitted), a securities broker can be a fiduciary to a customer where "[t]he relationship between a securities broker and its customer is that of principal and agent." Id. (applying Texas law).

In the instant case, the Bank's employees have made it abundantly clear that the defendants did not act as agents for the Bank, but rather conducted their business at arm's length in a principal-to-principal relationship. See J.A. at 272-73 (Mendez Dep. at 56-57); id. at 241-42 (Aguirre Dep. at 85-86). There was accordingly no formal relationship giving rise to a fiduciary duty, and the record reveals no informal relationship which could allow the imposition of such a duty. See, e.g., Farah v. Mafrige & Kormanik, P.C., 927 S.W.2d 663, 675 (Tex. App. 1996) ("[T]he fact a business relationship has been cordial and of long duration is not by itself evidence of a confidential relationship. The fact one businessman trusts another and relies upon another to perform a contract does not rise to a confidential relationship. Subjective trust is not enough to transform arms-length dealing into a

34

fiduciary relationship." (citations omitted)). Because Epley and Alex. Brown were not fiduciaries, they cannot be liable for the alleged breach of a fiduciary duty.

Nor has the Bank presented sufficient evidence to allow its allegation of negligence to go to the jury. The essential elements of the tort of negligence include the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and damages to the plaintiff that are proximately caused by the breach. See Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990). In this case, the Bank alleges that the defendants "owed a duty to use reasonable care in selling securities to Plaintiffs and in advising Plaintiffs to purchase securities[,]" Compl. (Apr. 11, 1995) at 24,¶ 87, reprinted in J.A. at 34, and breached that duty "[b]y recommending and selling to Plaintiffs securities which they knew or should have known were highly speculative and risky, and were unsuitable investments for Plaintiffs in light of their financial condition, risk profile and investment objectives." Id. at ¶ 88.

While a securities broker acting as an agent has a "duty to disclose to the customer information that is material and relevant to the order[,]" Magnum Corp., 794 F.2d at 200, Epley and Alex. Brown were not, as we have discussed above, acting as the Bank's agents. The Bank has directed us to no authority that would support a broad general duty of a principal selling a security to warn another principal that an investment may be imprudent or may not meet all of a buyer's investment goals, and we rather doubt that Texas would impose such a duty. In any event, it is apparent that, in light of the undisputed facts of this case, Epley and Alex. Brown met any duty they may have had by adequately informing the Bank of the risks and advantages of CMO investment.

Similar to the federal action for fraud under § 10(b), the Texas common law tort actions of fraud and negligent misrepresentation contain the element of reliance. See Trenholm v. Ratcliff, 646 S.W.2d 927, 930 (Tex. 1983) (elements of fraud); Federal Land Bank Ass'n v. Sloane, 825 S.W.2d 439, 442 (Tex. 1992) (elements of negligent misrepresentation). As we have explained in part II.A. of this opinion, the Bank cannot show justifiable reliance in light of the undisputed

35

facts of this case. Accordingly, the district court correctly granted summary judgment against the Bank on these claims.

Finally, the Bank contends that Alex. Brown, which was incorporated under the laws of Maryland, should be liable for a violation of the Maryland Securities Act, Md. Code Ann., Corps. & Ass'ns §§ 11-101 to 908. Specifically, the Bank alleges that the defendants violated § 11-302(c) of the Act by failing to advise the Bank of the risks involved with investing in CMOs.

Section 11-302(c) provides:

> (c) Misrepresentations.--In the solicitation of or in dealings with <u>advisory clients</u>, it is unlawful for any person knowingly to make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

Md. Code Ann., Corps. & Ass'ns § 11-302(c) (emphasis added). The Act specifies that an "`[i]nvestment adviser' does not include . . . [a] broker-dealer or its agent whose performance of[investment advisory services] is solely incidental to the conduct of business as a broker-dealer and who receives no special compensation for them." Md. Code Ann., Corps. & Ass'ns § 11-101(h)(2)(iv). In this case, it is clear that, to the extent that Epley and Alex. Brown provided "investment advisory services," such services were "solely incidental to the conduct of business as a broker-dealer." <u>Id.</u> Because the Bank was not an "advisory client" of the defendants, § 11-302(2)(c) does not apply, and the Bank cannot pursue an action under this statute.

For the foregoing reasons, the district court's grant of summary judgment is affirmed.

<u>AFFIRMED</u>

36